1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT

9

FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11

ROBERT D. BONILLA, JR.,

12

Petitioner,

13

v.

14

GISELLE MATTESON,

15

Respondent.

16

Case No.  1:20-cv-00806-NONE-HBK

FINDINGS AND RECOMMENDATIONS TO DENY PETITION FOR WRIT OF HABEAS CORPUS AND TO DECLINE TO ISSUE CERTIFICATE OF APPEALABILITY[1]

FOURTEEN-DAY OBJECTION PERIOD

(Doc. No. 1)

17

18

19

20

21

22

Petitioner Robert D. Bonilla, a state prisoner proceeding *pro se*, has pending a petition for writ of habeas corpus under 28 U.S.C. § 2254.  (Doc. No. 1).  The petition raises one ground for relief:  the admission of certain evidence by the prosecution's gang expert at trial violated Petitioner's Sixth Amendment right to confrontation.  (*Id*. at 7-8).  For the reasons set forth below, the undersigned recommends the district court deny Petitioner any relief on his petition and decline to issue a certificate of appealability.

23

## I.  BACKGROUND

24

### A.  Procedural History

25

26

Bonilla initiated this case on May 18, 2020 by filing the instant petition.  (Doc. No. 1). On June 15, 2020, the Court ordered Respondent to respond to the petition.  (Doc. No. 7).  After

27

---

28

[1] This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302 (E.D. Cal. 2019).

1  being granted an extension of time, Respondent filed an answer to the petition on October 12,

2  2020 and lodged the pertinent state court record.  (Doc. Nos. 15, 16, 17).  On November 17, 2020,

3  this case was reassigned to the undersigned.  (Doc. No. 18).  After being granted an extension of

4  time, Petitioner filed a reply to the answer on December 28, 2020.  (Doc. No. 22).  This matter is

5  deemed submitted on the record before the Court.

6  **B.  Facts Based Upon the State Court Record**

7  In 2017, a Fresno County jury convicted Bonilla of battery causing serious bodily injury

8  and assault by means likely to produce great bodily injury.  (Doc. No. 1 at 11; Doc. No. 15 at 6).

9  Bonilla's sentence was enhanced by certain gang-related sentencing enhancements resulting in an

10  18-year term of imprisonment.  (Doc. No. 1 at 11-12).  The Court adopts the pertinent facts of the

11  underlying offenses, as summarized by the California Court of Appeal.  A presumption of

12  correctness applies to these facts.  *See* 28 U.S.C. § 2254(e)(1); *Crittenden v. Chappell*, 804 F.3d

13  998, 1010-11 (9th Cir. 2015).

14  **Factual Summary**

15  **I.  Assault on John Doe**

16  On March 6, 2016, John Doe, who is associated with a Fresno gang
17  called Muhammad, was walking with three friends through
    Northside Pleasant gang territory—a rival of Muhammad.  The
18  three friends were walking a bit in front of John Doe when he was
    approached by a car.  One of the persons in the vehicle, later
19  identified as Jarmal Packard, asked John if he was "Lil H from
    Walnut Snoova."  John understood the question to be whether he
20  was part of Walnut Street Hoover gang, but John was not with that
    gang, so he answered "no"; at this point, John's friends had run
21  away.  Jarmal and defendant, whom John recognized as Lil' Action
    (also known as Jlokz) and Lil' Rob, respectively, exited the car and
22  assaulted John.  John recognized Lil' Rob through videos of Lil'
    Rob on the internet, which other people had shown John.  John later
23  told the investigating detective he knew defendant/Lil' Rob as an
    East Lane Crips gang member—a gang that is not friendly to John.
24  As for Jarmal/Jlokz, he and John had been at juvenile hall at the
    same time, although they had been in different units; John assumed
25  Jarmal/Jlokz was a Northside Pleasant gang member, a gang not
    friendly to John.  During the assault, John was hit on his head from
26  behind; he fell to the ground, went in and out of consciousness, and
    awoke in the hospital, where he was treated for facial bone fractures
27  and a lip contusion.

28  John's friend, C.J., one of the three friends John had been walking
    with that day, was interviewed by Detective Mayo a few days after

the assault.  C.J. told Mayo that he, John, and two other friends were walking on Fairmont Street, and they saw an old, white car that looked suspicious.  John walked away from the group and, although C.J. had turned a corner on the street, he then looked back to see if John was coming with them.  When he looked back, he saw people get out of a car and attack John.  He described them as a "light skinned dude with dreads," a "dark boy with a low-cut afro," and a third person wearing blue jeans who C.J. did not see as well because the other two were in front of him.  They started punching John, and he ended up on the sidewalk; the man with the dreadlocks held John down, stomped on him, and grabbed his head.  C.J. and his friends went back to get John after those assaulting him drove away—C.J. thought those in the car were going to get guns, so C.J. wanted to get John out of the area.  They walked John to his house, no one answered, so John walked to a neighbor's house, and C.J. and the rest of the group left.

At trial, C.J. testified for the defense and recanted what he told Mayo during his interview about witnessing any part of the assault.  According to his trial testimony, he and three friends were walking with John on Fairmont Street to visit a girl.  John was walking slower than the rest of the group, so they did not stay together.  The three friends turned left and realized John was not with them anymore.  C.J. checked back around the corner and saw John on the ground.  C.J. did not see any vehicles in the area, except "vehicles just driving past like normal."  John had injuries to his head and he was confused, so they walked with him to a neighbor's house.  Although he thought he saw two people in a car passing by on the street, C.J. did not see what happened to John.  His description to Detective Mayo of the three individuals he saw assault John was based solely on photographs John's mother showed C.J. when he was at the hospital visiting John; all the facts about those who committed the assault that C.J. related to Mayo were based on what John's mother told him, not his own observations.

**II. Prosecution's Theory on Gang Enhancement Allegations**

As set out below, the prosecution offered evidence Jarmal/Jlokz was a Northside Pleasant gang member, defendant was an East Lane Crips gang member, and both were rivals of the gang with whom they believed John was associated.  Evidence indicated that Northside Pleasant and East Lane Crips gang members are part of the MUG gang alliance, they often associate with each other, and are expected to back each other up.  There was evidence that John was in Northside Pleasant territory when he was assaulted.  Expert testimony indicated Jarmal/Jlokz instigated the assault, assisted by defendant, to let everyone know, including the victim, rivals should not come into the neighborhood.  The prosecution offered expert testimony that an assault, such as the one on John, would benefit each of the gang members who participated and their respective gangs.

///

///

3

### III. Relevant Gang Testimony at Trial

. . . .

### B. Detective Curtis Davis

Detective Davis has worked with the Fresno Police Department since 1994; he has worked within the MAGEC unit since 2006.  In November 2012, he was assigned to the Violent Crime Suppression unit when he had contact with defendant.  Davis noted defendant was with Javonte Askew, whom Davis had contacted on prior occasions and knew to be an East Lane Crips gang member, Oshea Pullen who was on juvenile probation at the time and had gang restrictions, and Eric Skinner who had "E" and "S" tattooed on his right and left wrists, respectively.  According to Davis, these tattoo symbols are associated with the East Lane Crips.  Defendant admitted to Davis he was an East Lane Crips member, he had been involved with the gang for four years, and he was childhood friends with Askew.

. . . .

### D. Sergeant Michael Smith

In May 2012, Sergeant Smith contacted defendant as part of a traffic stop on Marks Avenue in Fresno.  There were three people in the vehicle: Tyrone Williams, Javonte Askew, and defendant.  Askew had been involved in a burglary where several firearms were stolen, and he was wanted on that case.  He was also involved in a shooting that had occurred in April 2012 in southwest Fresno.  Smith was also familiar with defendant by name due to defendant's association with other individuals with whom officers had dealings.

### E. Officer Michael Aguilar

Officer Aguilar was working for the Violent Crime Impact unit of the Fresno Police Department on May 28, 2014, when he made contact with a vehicle in northwest Fresno with four people inside, including defendant, Yohonas Kahassay, and two women—one of whom was defendant's girlfriend.  Later testimony by gang expert Fry indicated Yohonas Kahassay is a self-admitted Northside Pleasant gang member.

### F. Detective Miguel Archan

Detective Archan was assigned to the Fresno Police Department Gun Unit in December 2015 when he contacted defendant.  He went to a residence on Ashlan Avenue in Fresno where he contacted defendant, Davon Crockett, and William Harris.  Defendant told Archan he knew he was not supposed to be hanging out with other gang members pursuant to his probation conditions, but they were making a rap video.

. . . .

4

### H. Detective Robert Fry

Detective Robert Fry was the prosecution's principal gang expert. He testified on Black criminal street gangs in Fresno, but focused most exclusively on Northside Pleasant and East Lane Crips. Fry testified extensively about his training and experience with Black gangs in Fresno, his knowledge of gang culture and gang alliances, and his process for validating individuals as members of particular gangs. He also testified at length about the background of Northside Pleasant and East Lane Crips gangs, each gang's pattern of criminal gang activity, the specific gang membership of Jarmal/Jlokz and defendant, and he opined hypothetically about whether conduct like that charged here would have been committed for the benefit of, in association with, or at the direction of the two gangs. The multiple facets of his testimony are topically summarized below.

Detective Fry is employed with the Fresno Police Department in the MAGEC unit. He explained his familiarity with the MUG and TWAMP alliances and indicated he has talked to or interacted with no less than 1,000 gang members, including at least 30 Northside Pleasant members. When his department makes an arrest for a gang-related crime involving Black gangs within Fresno, Fry is tasked with preparing a gang packet to prove whether a subject is a gang member. To do so, he compiles information from the Fresno Police Department Records Management System (FPDRMS), which lists subjects' information, their associations, and any contacts they have had with law enforcement. He also reviews police reports written by patrol officers or detectives, and he reviews social media—primarily Facebook—to view photographs of certain gang members they have posted publicly. He uses social medial to look at photos of gang members associating with one another, reviewing comments made by gang members about their current rivalries, or talking about gang-related crimes: "Gang members also post photos of themselves using hand signs, as well as typing some kind of animation or wording to represent their gang."

Fry validates individuals as gang members based on factors such as whether a subject is arrested with known gang members or associates with known gang members; whether the subject has been identified as a gang member by a reliable source, or has been photographed displaying hand signs with other gang members; whether the subject has self-admitted gang membership, written about a gang through graffiti, or been on a "hit list" or gang document; and whether the individual has gang tattoos or wears gang clothing.

As for gang culture, Fry explained gang members thrive on respect. They may lose respect or "lose face" if they do not act on challenges from rivals. For example, if they see a rival gang member, they may act on it by shooting or assaulting that rival. Maintaining respect requires the gang member to act upon any perceived disrespect, usually in violent ways. Respect is gained, generally, from one's own gang or rival gang members through acts

of violence—the more respect a gang member has, the more respect the gang has as a whole.  Gang members also gain respect from citizens and witnesses in their neighborhoods who refuse to cooperate in gang investigations due to fear of retaliation.

### 1. Northside Pleasant

In the 1970's, the Los Angeles Diamond Crips gang moved several members to the Fresno area.  That group split into different factions—one faction moved to North Fresno and became Northside Pleasant, and the other faction moved to East Fresno and became the East Lane Crips.  Northside Pleasant has approximately 75 active members, and their primary rival is the Strother Boys gang.  Northside Pleasant claims territory at the 4500 block of North Pleasant Street, and most Northside Pleasant gang members are located within the intersection of Fairmont and Holt Streets. The assault in this case occurred "in the heart" of Northside Pleasant territory.  Gang members identify by the number 45 or 4500, letters or symbols of the New York Yankees, and the letters "Y," "YN," and "N."  The gang's hand signs including making the letter "N," or holding five fingers up on one hand and four fingers on the other.  Hand signs are used by gang members to represent their gang or to disrespect another gang: "using hand signs" is "putting it out there for everyone to know that they are gang members, and they are representing their hood."  The gang's identifying clothing includes New York Yankees apparel and the color blue.

Northside Pleasant's primary criminal activities include possession and sale of narcotics, possession of illegal weapons, robbery, human trafficking, and felony assault, which includes physical assault, shootings, and stabbings.

### 2. Northside Pleasant's Pattern of Criminal Gang Activity

Evidence of Northside Pleasant's pattern of criminal gang activity was introduced through certified court records of three individuals. The admitted court records showed Donald Henderson had been convicted of possession of a firearm.  Fry opined Henderson was a Northside Pleasant gang member based on his investigation into Henderson and multiple prior contacts with Henderson, including his arrest of Henderson several times.  Fry also researched Henderson for purposes of this case and prepared a gang packet. He could not identify the specific dates of his prior contacts with Henderson, nor did he note those dates in the gang packet he prepared.  Fry explained he validated Henderson by researching him for this case, talking with other officers, and reviewing officer reports.  Fry based his opinion on the facts that Henderson associates with known gang members, he has been arrested with known gang members, he wears gang clothing, and there are photographs showing him pictured with other known gang members and displaying gang hand signs.

Admitted certified court records showed Collin Stowers had pleaded guilty to assault with a firearm and admitted his crime was committed for the benefit of, at the direction of, or in association with a criminal street gang section 186.22(b)(1). The records do not specify Stowers's gang association, but Fry opined Stowers was a member of Northside Pleasant. Fry had three or four prior personal contacts with Stowers in the Fairmont/Holt area of Fresno where John Doe was assaulted and in the area of Regency and Gates, a location where Northside Pleasant members congregated at that time.

Admitted certified court records also showed Gary Banks, with whom Fry had had no personal contact, had been convicted of home invasion robbery. Fry opined Banks was a Northside Pleasant gang member based on his research showing Banks had self-admitted being a Northside Pleasant member, he had a tattoo of "NY" on his hand, which represented Northside Pleasant, and he associated with known gang members.

. . . .

**5. East Lane Crips' Pattern of Criminal Gang Activity**

. . . .

As for defendant, Fry had spoken to and contacted him at least five different times, primarily in the Fairmont and Holt area, but also in the 4800 block of East Lane. In February 2013, Fry had contacted defendant in an apartment complex near Clinton and West streets; he was with several Dog Pound gang members, Javonte Askew, and Ernest Dean (a Modoc Boy gang member). Fry prepared a gang packet on defendant that was compiled by searching social media including Facebook and YouTube. Photographs and videos of defendant admitted into evidence showed defendant with other Northside Pleasant gang members, including Collin Stowers. Among the videos was one with the words "Free Javonte," which was significant to Fry because Askew is an East Lane Crips gang member who was incarcerated at that time. Another video showed defendant making the letter "E" with his right hand to represent "East Side." One of the videos was filmed at the Ranchwood apartment complex, which Fry explained he knew was in East Lane Crips territory as he had been to that complex many times. Multiple social media photographs were admitted as exhibits and showed defendant pictured with other known Northside Pleasant, East Lane Crips, and Dog Pound gang members—all part of the MUG alliance. Based on all of this, and testimony from Detective Mayo, Detective Aguilar, and Sergeant Smith about personal contacts they had with defendant, Fry opined defendant was an active member of East Lane Crips.

**6. Whether Defendant's Charged Conduct was Committed for the Benefit of, at the Direction of, or in Association with a Criminal Street Gang**

Fry testified defendant's assault on John was intended to benefit both Northside Pleasant and East Lane Crips: ""By [defendant]

exiting the vehicle and assisting [Jlokz] and assaulting a rival gang member [John Doe], it shows that [this] would definitely benefit his gang by letting everyone know, letting the victim know you do not come in our neighborhood if you're a rival gang member. [¶] ... [¶] You have [Jlokz] who is a validated Northside Pleasant Street gang member and you have [defendant] who is a validated East Lane Crip[s] member.  You have two gang members associated together to commit a violent crime."  This evidenced an intent to promote, further, or assist their respective gangs: "By them assaulting a rival gang member[,] that promotes their gang.  That gives them more respect."  A gang member believes that allowing a rival to walk in "someone else's neighborhood or territory" without acting upon it shows weakness.

Fry explained it is expected that gang members will back each other up—it is very important that gang members can trust each other.  Assisting a fellow gang member to assault someone would benefit the assisting gang member because it causes fear to the victim and the friends of the victim.  Hypothetically, Fry testified if a carload of people including two known aligned gang members get out of the vehicle along with a third unidentified person to assault a perceived rival, the aligned gang members are acting in association with their gangs.  It is not unusual for Northside Pleasant and East Lane Crips to work together—members from those two gangs would be expected to back each other up.

**IV. Prosecution's Closing Argument**

In closing argument about the gang enhancement allegation, the prosecution focused on its theory that defendant benefitted and acted in association with Northside Pleasant by getting out of the car to help Jarmal (moniker, Jlokz) assault John:

"Before we go to that let me just kind of explain to you in general.  There's two gangs, Northside Pleasant, East Lane.  In order for you to even consider the gang enhancement it needs to be proven that there is a gang in Fresno called Northside Pleasant and that there's a gang in Fresno called East Lane.  So in order to prove those up it is required for certain things.  There's a common sign or symbol for Northside Pleasant.  You heard N and those things, color blue.  They have one or more primary activit[ies], and this is what Detective Fry focused his testimony on that one afternoon we poured through that activity, is drug sales, possession, possession of illegal weapons, burglaries, robberies, assaults.  And they engage in a pattern of criminal activity.

"Again, we need to show East Lane also does these things.  So East Lane has a common sign or symbol, the ESL, the EKC, I believe all of those things that are associated with the color blue with that.  There's three or more members.  We heard the numbers [are] smaller for East Lane approximately 45 upwards of 70 Northside Pleasant as per Detective Fry.  They have [] primary activities.  For them it's similar.  Possession of narcotics, possession of narcotics for sale, sales, illegal possession of firearms, thefts, vehicle thefts and assaults.  So [for] each one [it] needs to be show[n] that they

engaged in a pattern of criminal activity.  And we probably heard when you were hearing from Detective Fry who are these other three people and what do they have to say and what do they mean and I don't understand, but we heard.  You will have the packets themselves.  Javonte Askew, which is Exhibit 25; Michael Smith, Exhibit 24; Nicholas Smith which is Exhibit 23, all relate to East Lane is showing the convictions establishing for you a pattern of criminal activity by that gang.  And likewise for Northside Pleasant, [Exhibit] Number 28 is Donald Henderson; [Exhibit] Number 26 is Collin Stowers, [Exhibit] Number 27 is Gary Banks. So[,] we have those two gangs.

"So[,] what's that mean to you[?]  We have to go back and understand how we apply this to these events.  The defendant committed the crime for the benefit of or in association with a criminal street gang and the defendant intended to assist[,] further or promote criminal conduct by gang members.  All right.  And then the People need not prove the defendant is an active or current member of the alleged criminal street gang.  In other words, if someone assists a gang member in criminal activity this gang enhancement applies.  So[,] in essence, all I had to have shown you is that this defendant assisted Jarmal Packard, [Jlokz], a Northside Pleasant gang member and assaulted [John].  That's it.  The whole aspect of East Lane was proven to you, but it doesn't need to be proven for you to find this true. That's it....

"So[,] did he assist them?  Did he assist them?  Well, who's the one that [John] says yell[ed] out to them?  It's [Jlokz].  I'm not going to repeat the line.  You've heard it.  Who starts the ball rolling?  [Jlokz] does.  He's Northside Pleasant.  Who decides to become involved on their own volition?  This defendant does.  When he [exits] that vehicle and assists in stomping out [John] he's done it for the benefit and association."

In his rebuttal argument, the prosecutor noted the exhibits showing the predicate offenses related to each gang would be available for the jury's review during deliberations and told the jury, "in essence, the only one that is important is Northside Pleasant."  The prosecutor then repeated the predicate offenses offered to prove the pattern of criminal gang activity relevant to Northside Pleasant.

## V. Instructions to the Jury

The trial court instructed the jury to consider whether Northside Pleasant and/or East Lane Crips qualified as criminal street gangs, and whether defendant's charged conduct was committed for the benefit of, at the direction of, or in association with Northside Pleasant and East Lane Crips.  The jury was also instructed that if it found defendant was guilty of any of the charged crimes, it could consider whether that offense was one of his gang's primary activities and, if so, it could consider that offense for purposes of determining whether the gang's pattern of criminal gang activity was proven.

1  *People v. Bonilla*, No. F075199, 2020 Cal. App. Unpub. LEXIS 667, at *3-27.

2      On direct appeal, the California Court of Appeal affirmed Bonilla's convictions and the

3  California Supreme Court denied review.  (Doc. No. 15 at 16).

4  **II.  APPLICABLE LAW**

5      A.  AEDPA General Principles

6      A federal court's statutory authority to issue habeas corpus relief for persons in state

7  custody is set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death

8  Penalty Act of 1996 (AEDPA).  AEDPA requires a state prisoner seeking federal habeas relief to

9  first "exhaus[t] the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(1)(A).  If

10  the state courts do not adjudicate the prisoner's federal claim "on the merits," a *de novo* standard

11  of review applies in the federal habeas proceeding; if the state courts do adjudicate the claim on

12  the merits, then the AEDPA mandates a deferential, rather than *de novo*, review.  *Kernan v.*

13  *Hinojosa*, 136 S. Ct. 1603, 1604 (2016).  This deferential standard, set forth in § 2254(d), permits

14  relief on a claim adjudicated on the merits, but only if the adjudication:

15
16          (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

17
18          (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

19  28 U.S.C. § 2254(d).  This standard is both mandatory and intentionally difficult to satisfy.

20  *Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2558 (2018); *White v. Woodall*, 572 U.S. 415, 419 (2014).

21      "Clearly established federal law" consists of the governing legal principles in the

22  decisions of the United States Supreme Court when the state court issued its decision.  *White*, 572

23  U.S. at 419.  Habeas relief is appropriate only if the state court decision was "contrary to, or an

24  unreasonable application of," that federal law.  28 U.S.C. § 2254(d)(1).  A decision is "contrary

25  to" clearly established federal law if the state court either: (1) applied a rule that contradicts the

26  governing law set forth by Supreme Court case law; or (2) reached a different result from the

27  Supreme Court when faced with materially indistinguishable facts.  *Mitchell v. Esparza*, 540 U.S.

28  12, 16 (2003).

1    A state court decision involves an "unreasonable application" of the Supreme Court's

2    precedents if the state court correctly identifies the governing legal principle, but applies it to the

3    facts of the petitioner's case in an objectively unreasonable manner, *Brown v. Payton*, 544 U.S.

4    133, 134 (2005), or "if the state court either unreasonably extends a legal principle from

5    [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to

6    extend that principle to a new context where it should apply." *Williams v. Taylor*, 529 U.S. 362,

7    407, (2000). "A state court's determination that a claim lacks merit precludes federal habeas

8    relief so long as fair-minded jurists could disagree on the correctness of the state court's

9    decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). The petitioner must show that the

10   state court decision "was so lacking in justification that there was an error well understood and

11   comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 103.

12   When reviewing a claim under § 2254(d), any "determination of a factual issue made by a

13   State court shall be presumed to be correct[,]" and the petitioner bears "the burden of rebutting

14   the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Burt*

15   *v. Titlow*, 571 U.S. 12, 18 (2013) ("[A] state-court factual determination is not unreasonable

16   merely because the federal habeas court would have reached a different conclusion in the first

17   instance.") (quoting *Wood v. Allen*, 558 U.S. 290, 293 (2010)).

18   As discussed earlier, for the deferential § 2254(d) standard to apply there must have been

19   an "adjudication on the merits" in state court. An adjudication on the merits does not require that

20   there be an opinion from the state court explaining the state court's reasoning. *Richter*, 562 U.S.

21   at 98. "When a federal claim has been presented to a state court and the state court has denied

22   relief, it may be presumed that the state court adjudicated the claim on the merits in the absence

23   of any indication or state-law procedural principles to the contrary." *Id*. at 99. "The presumption

24   may be overcome when there is reason to think some other explanation for the state court's

25   decision is more likely." *Id*. at 99-100. This presumption applies whether the state court fails to

26   discuss all the claims or discusses some claims but not others. *Johnson v. Williams*, 568 U.S.

27   289, 293, 298-301 (2013).

28   ///

While such a decision is an "adjudication on the merits," the federal habeas court must still determine the state court's reasons for its decision in order to apply the deferential standard. When the relevant state-court decision on the merits is not accompanied by its reasons,

> the federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning. But the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed.

*Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).  The federal court "looks through" the silent state court decision "for a specific and narrow purpose—to identify the grounds for the higher court's decision, as AEDPA directs us to do."  *Id.* at 1196.

> When . . . there is no reasoned state-court decision on the merits, the federal court "must determine what arguments or theories . . . could have supported the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court."  *Richter*, 562 U.S. at 102.  If such disagreement is possible, then the petitioner's claim must be denied.  *Ibid*.

*Sexton*, 138 S. Ct. at 2558.

### III.  APPLICABLE LAW AND ANALYSIS

This Court reviews the last reasoned opinion—in this case, that of the California Court of Appeal.  Because the Court of Appeal rejected petitioner's claims on the merits, the deferential standard of § 2254 applies.

#### A.  Ground One: Confrontation Clause Violation

##### 1.  Background

Bonilla claims that his Sixth Amendment right to confrontation was violated when the trial court admitted certain testimony from the prosecution's gang expert.  (Doc. No. 1 at 7). Specifically, Bonilla argues that his rights were violated when the prosecution's gang expert relied on hearsay containing case-specific facts in order to establish that certain predicate offenses

1  were committed by Northside Pleasant gang members, as required for Bonilla's gang sentencing

2  enhancement.  (*Id*.); see Cal. Pen. Code § 186.22.

3       In his pre-trial motion, Bonilla sought to preclude the testimony of Detective Fry, arguing

4  that his forthcoming testimony regarding Banks and Henderson constituted case-specific hearsay

5  in violation of *Sanchez*.  (Doc. No. 1 at 20, 23-24, Doc. No. 17-5 at 47-48, 53-54).  The trial court

6  denied the motion and permitted Fry to testify, finding that *Sanchez* "merely precludes experts

7  from specifics of relied upon hearsay that involves the case's specific fact which would be the

8  facts or circumstances of this case and/or defendant's involve[ment] in this case."  (*Id*. at 49).

9  The trial court further provided "latitude to experts to describe background information,

10  knowledge in the area of their gang expertise."[2]  (*Id*. at 55).

11       In convicting Bonilla of his sentencing enhancement, the jury necessarily found that

12  Banks and Henderson were part of the Northside Pleasant gang and had committed the predicate

13  offenses necessary for Bonilla's gang sentencing enhancement.  (Doc. No. 17-10 at 224).

14                 **2.  *Sanchez* Claim**

15       On direct appeal, Bonilla raised his confrontation clause claim, arguing that Fry's

16  testimony concerning Henderson and Banks violated his rights under *Sanchez*.  (Doc. No. 17-4 at

17  3).  The State argued that the gang expert's testimony about the predicate offenses was

18  background information that may be used without violating *Sanchez*.  (*Id*.).  The California Court

19  of Appeal rejected Bonilla's claim, finding that even if some of Fry's statements violated

20  Bonilla's confrontation clause rights, any such error was harmless beyond a reasonable doubt.

21  (*Id*.).  In *Sanchez*, the California Supreme Court found that case-specific out-of-court statements

22

23

24      [2] The trial court, however, did not permit the expert to "relate as true any case specific facts, any hearsay

25  statements, unless they are independently proven by competent evidence or covered by the hearsay
exception."  (*Id*.).  The trial court defined case specific facts as "those relating to particular events and

26  participants alleged to have been involved in the case being tried and that relates to these particular facts or
events for the three charged crimes here charged against Mr. Bonilla and as to Mr. Bonilla himself."  (*Id*.

27  at 55-56).  The trial court found that the gang expert could testify to "membership in a gang, color, signs,
symbols, status, pattern of criminal history, primary activities or predicate offenses" and that this

28  information was admissible as long as the information did not rely on "case specific facts."  (*Id*. at 56).

1    offered by an expert and not otherwise admissible are necessarily offered for their truth, and

2    therefore violate the U.S. Constitution's confrontation clause.[3]  *See* 63 Cal. 4th at 686.

3                  i. **State Appellate Court Decision- *Sanchez***

4        Concerning Petitioner's *Sanchez* claim, the Court of Appeal found as follows:

5
6
           We begin our analysis by presuming any out-of-court statements
           Fry related to the jury to support his opinion Henderson and Banks
7            were Northside Pleasant gang members were necessarily case-
           specific under *Sanchez* because they are specific facts about
8            specific individuals relevant to proving the gang-enhancement
           charge against defendant.  (See *Ochoa, supra*, 7 Cal.App.5th at pp.
9            588-589 [pursuant to *Sanchez*, out-of-court admissions of gang
           membership are case-specific facts].)

10            *Sanchez* set out a two-step analytical framework for determining the
           admissibility of case-specific out-of-court statements by an expert:
11            (1) consider whether the case-specific fact constitutes hearsay by
           determining if the fact is a statement made out of court; whether it
12            is offered to prove the truth of the facts it asserts; and whether it
           falls under a hearsay exception; and (2) if the hearsay statement is
13            being offered by the prosecution in a criminal case, and the
           *Crawford* limitations of unavailability, as well as cross-examination
14            or forfeiture, are not satisfied, a second analytical step is required—
           "[a]dmission of such a statement violates the right to confrontation
15            if the statement is *testimonial hearsay*, as the high court defines that
           term."  (*Sanchez, supra*, 63 Cal.4th at p. 680.)

16            Here, the prosecution introduced evidence of three predicate
           offenses, committed by Collin Stowers, Donald Henderson, and
17            Gary Banks to establish Northside Pleasant's pattern of criminal
           gang activity.  Detective Fry opined each of these individuals were
18            active Northside Pleasant gang members; defendant challenges
           Fry's testimony as to Banks and Henderson only.  We turn first to
19            consider whether Fry's testimony about Henderson and Banks
           constituted hearsay.
20
           As to Henderson, Fry testified he was a Northside Pleasant gang
21            member and specifically noted he (1) associates with known gang
           members; (2) has been arrested with known gang members; (3)
22            wears clothing associated with the gang; and (4) has been
           photographed with other known gang members exhibiting gang
23            hand signs.  If Fry had no personal knowledge of these facts and
           learned them from statements made out of court, that testimony is
24            hearsay.  (See *Sanchez, supra*, 63 Cal.4th at p. 685 [while an expert

25
                         

26    [3] *Sanchez* held that "[w]hen any expert relates to the jury case-specific out-of-court statements, and treats
     the content of those statements as true and accurate to support the expert's opinion, the statements are
27    hearsay.  It cannot logically be maintained that the statements are not being admitted for their truth.  If the
     case is one in which a prosecution expert seeks to relate *testimonial* hearsay, there is a confrontation clause
28    violation unless (1) there is a showing of unavailability and (2) the defendant had a prior opportunity for
     cross-examination or forfeited that right by wrongdoing."  *Sanchez*, 63 Cal. 4th at 686.

may tell the jury in general terms that he relied on hearsay sources in reaching his opinion, he cannot relate the out-of-court statements themselves unless they are independently proven].)  With respect to the first three facts, the record does not establish they were hearsay.

Though Fry acknowledged he validated Henderson as a gang member by talking with other officers and reviewing police records, he also testified his opinion was based on multiple personal contacts with Henderson, including arresting him several times; many of those contacts occurred in Northside Pleasant territory. Thus, it is more likely than not Fry had personal knowledge Henderson associates with known gang members, wears gang clothing, and has been arrested with known gang members. Because Fry was not questioned about the extent of his personal knowledge of these facts, defendant cannot demonstrate they were necessarily garnered from out-of-court statements as opposed to Fry's personal knowledge.  (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573, 43 Cal. Rptr. 3d 741 [it is a fundamental rule of appellate law that the judgment challenged on appeal is presumed correct, and it is the appellant's burden to affirmatively demonstrate error].)

With respect to Fry's testimony about photographs of Henderson showing him with known gang members making gang signs, defendant asserts that if Fry had not personally viewed the photographs, his testimony about them would be based on out-of-court statements from others about the photographs' contents. While that may be true, Fry testified he searches social media photographs to make gang validations.  And, as with the other facts about Henderson, Fry was not questioned about his personal knowledge of the photographs' contents, and defendant cannot establish Fry's testimony was necessarily based on hearsay in that regard.

Nevertheless, Fry's testimony that those in the photographs, perhaps including Henderson, were making gang signs gives us pause for another reason.  Fry testified hand signs "are used by gang members to represent their gang or to disrespect another gang," and when gang members use hand signs, they are "putting it out there for everyone to know they are gang members, and they are representing their hood."  If the photographs Fry mentioned were themselves communicating an out-of-court statement offered for the truth of the matter asserted—that the person making the hand sign is a member of a specific gang—that too may be hearsay.

Photographs themselves are not typically amenable to characterization as *statements*, but to the extent the hand sign made by a person captured in the photograph was nonverbal conduct intended by that person to be a substitute for oral or written verbal expression of gang membership, the photographs themselves might arguably constitute an out-of-court *statement* by the person making the hand sign. (Evid. Code, § 225 ["Statement means (a) oral or written verbal expression or (b) nonverbal conduct of a person intended by him as a substitute for oral or written verbal expression."].)

15

1   The conduct captured in the photographs Fry referenced is
2   markedly different from autopsy photographs that the California
    Supreme Court has held do not constitute hearsay.  (*People v.*
3   *Garton* (2018) 4 Cal.5th 485, 506, 229 Cal. Rptr. 3d 624, 412 P.3d
    315 [autopsy "photographs are not statements"].)  Posing for a
    photograph while contemporaneously making hand signs meant to
4   convey a message of gang affiliation is wholly distinguishable from
    an autopsy photo where one would be hard-pressed to argue the
5   cadaver intended to convey a nonverbal communication.
    Photographs of individuals posing with hand signs are also different
6   from photographs of individuals bearing gang-affiliated tattoos.
    Unlike gang hand signs made contemporaneous with the
7   photograph, a tattoo is not contemporaneous conduct, and its mere
    visibility in the photograph may not be intentional.  To the extent
8   Fry repeated the contents of photographed statements in court for
    the truth of the matter asserted (gang membership of the person
9   making the hand sign), there may be a colorable argument such
    testimony is hearsay.
10
11   As to Banks, the second of three predicate offenders offered by the
    prosecution to establish Northside Pleasant's pattern of criminal
12   gang activity, Fry opined Banks was a Northside Pleasant gang
    member and related the following facts: (1) Banks had self-
13   admitted he was a Northside Pleasant gang member; (2) he had a
    tattoo of "NY" on his hand; and (3) he associates with known gang
    members.  Fry conceded he had no personal knowledge about
14   Banks; these facts necessarily derived from reports or
    documentation written by others or from statements by officers who
15   related this information; and the facts were offered for the truth of
    the matter it asserted.  This was hearsay.
16

17   **ii.  Analysis- *Sanchez***

18   To the extent Bonilla claims that the state appellate court's application of *Sanchez* was in

19   error, his claim is not cognizable on habeas review.  Federal habeas corpus relief "does not lie for

20   errors of state law," *see Estelle v. McGuire*, 502 U.S. 62, 67 (1991), and this Court is bound by

21   the state court's determination based on state law, *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005)

22   (per curiam) ("[A] state court's interpretation of state law, including one announced on direct

23   appeal of the challenged conviction, binds a federal court sitting in habeas corpus.").

24   To the extent Bonilla argues that the state court's *Sanchez* decision violates clearly

25   established federal law, his claim fails.  Though *Sanchez* applies and interprets the U.S.

26   Constitution to provide additional protections to criminal defendants in California, these

27   additional protections have not been adopted by the U.S. Supreme Court.  *See Chavez v. Sullivan*,

28   No. 19-15543, 2020 U.S. App. LEXIS 39672, at *2 (9th Cir. 2020) (finding that petitioner's

1  claim that the trial court violated *Sanchez* was not a violation of clearly established federal law;

2  "[petitioner] does not . . . cite any U.S. Supreme Court decision applying *Crawford* in the same

3  manner as *Sanchez*); *Peters v. Arnold*, 765 F. App'x. 389, 390 (9th Cir. 2019) (holding that

4  *Sanchez* "does not count as clearly established federal law," because it "is not a United States

5  Supreme Court decision"); *Zavala v. Holland*, No. 16-15984, 2020 U.S. App. LEXIS 12076 at *3

6  (9th Cir. Apr. 16, 2020) (same).  Therefore, Bonilla's *Sanchez* claim is not cognizable on federal

7  habeas review and should be denied.

### 3. Confrontation Clause Claim

9  Bonilla also claims that his Sixth Amendment right to confrontation was violated when

10  the trial court admitted certain testimony from the prosecution's gang expert.  (Doc. No. 1 at 7).

### i. State Appellate Court Decision

12  In rejecting this claim, the state appellate reasoned as follows:

> Only *testimonial* hearsay admitted in a criminal proceeding implicates the confrontation clause, subject to unavailability and cross-examination limitations.  (*Crawford, supra*, 541 U.S. at pp. 62, 68; *Sanchez, supra*, 63 Cal.4th at p. 680.)  "Testimonial statements are those made primarily to memorialize facts relating to past criminal activity, which could be used like trial testimony. Nontestimonial statements are those whose primary purpose is to deal with an ongoing emergency or some other purpose unrelated to preserving facts for later use at trial."  (*Sanchez, supra*, at p. 689, fn. omitted.)  Further, to be testimonial, "the statement must be made with some degree of formality or solemnity."  (*People v. Dungo, supra*, 55 Cal.4th at p. 619; *see Sanchez, supra*, at pp. 692-694.)

> The parties agree the record does not establish the precise source of any hearsay related by Fry.  As the prosecutor was the proponent of Fry's testimony, defendant argues it was the prosecutor's burden to establish the hearsay was nontestimonial; if the record is undeveloped in this regard, it should be assumed the hearsay Fry related was testimonial.  The People argue it is defendant's obligation to establish error in the appellate record, but even if Fry related testimonial hearsay to the jury, it was harmless under the *Chapman* prejudicial-error analysis.

> We are skeptical the undeveloped record warrants the presupposition of a constitutional error on appeal.  It is true the proponent of proffered hearsay—which, at trial in this case, was the People—has the burden of establishing its admissibility under an exception to the hearsay rule and that it is not testimonial.  (*People v. Morrison* (2004) 34 Cal.4th 698, 724, 21 Cal. Rptr. 3d 682, 101 P.3d 568; *Ochoa, supra*, 7 Cal.App.5th at p. 584, citing *Idaho v.*

*Wright* (1990) 497 U.S. 805, 816, 110 S. Ct. 3139, 111 L. Ed. 2d 638 [state has the burden of proof regarding admissibility under confrontation clause].)  Yet, here, the court ruled before trial that under *Sanchez*, testimony about the predicate offenses was background information, not case-specific, as long as it did not relate to participants or events in the case.  Based on this ruling, Fry's statements about the predicate offenses were not inadmissible hearsay and, thus, did not implicate the confrontation clause.  As such, the prosecutor had effectively met his burden of establishing the admissibility of Fry's predicate offense testimony.  Even if defendant had interposed hearsay and/or confrontation clause objections during Fry's testimony about Henderson and Banks, which he did not do, the prosecutor would not have been required to make any showing of the nontestimonial nature of the hearsay sources due to the trial court's interpretation of *Sanchez*.

Further, it is clear from the pretrial hearing on this matter that defense counsel's interpretation of *Sanchez* would necessarily render Fry's predicate offense testimony containing out-of-court statements to be case-specific hearsay, which *could* implicate the confrontation clause.  Once such testimony was offered by the prosecution through Fry, it was defendant's obligation, as a practical matter, to develop the record for purposes of appeal because his objection had effectively already been ruled upon.  While defense counsel's cross-examination established some of Fry's specific predicate-offense testimony related or potentially related hearsay to the jury, no questions were asked about the specific source of any hearsay to determine its testimonial nature.  On appeal, defendant has the burden to affirmatively establish error; he cannot demonstrate a confrontation clause violation because of the undeveloped record.  (*See People v. Giordano* (2007) 42 Cal.4th 644, 666, 68 Cal. Rptr. 3d 51, 170 P.3d 623 ["error must be affirmatively shown"].)

Nevertheless, even if we place the failure to adequately develop the record squarely at the People's feet, only hearsay related to Banks is arguably testimonial.  As to Banks, Fry testified his sources of information came from other officers, police records, records contained in the FPDRMS, and his review of social media photographs.  Some of those records were likely developed for the primary purpose of establishing facts for use in a criminal prosecution and bear indicia of formality or solemnity—i.e., some sources were likely testimonial.  (*Sanchez, supra*, 63 Cal.4th at pp. 687-694 [discussing evolution of the *Crawford* doctrine's primary purpose and formality factors].)

As to Henderson, only Fry's testimony about the photographs is arguably hearsay, as discussed above.  However, photographs, particularly those posted to social media accounts, are extremely unlikely to be testimonial.  While there are no details about the photographs Fry discussed, there is no basis to assume the photographs were created for the primary purpose of use in a criminal prosecution, particularly given their content: known gang members posing together making gang signs.

18

1

2

> Assuming the erroneous admission of *testimonial* hearsay in
> violation of *Crawford* as to Banks, that error was harmless beyond
> a reasonable doubt as set forth below.

3

### ii. Analysis- Confrontation Clause

4    The Sixth Amendment's confrontation clause provides that "[i]n all criminal prosecutions,

5    the accused shall enjoy the right . . . to be confronted with the witnesses against him . . .."  U.S.

6    Const., Amend. VI.  A federal habeas petitioner may be granted relief on a confrontation clause

7    claim if he can prove a Sixth Amendment violation under *Crawford v. Washington*, 541 U.S. 36,

8    59 (2004).  The confrontation clause bars "admission of testimonial statements of a witness who

9    did not appear at trial unless he was unavailable to testify, and the defendant . . . had a prior

10   opportunity for cross-examination" regardless of whether the statements are deemed reliable.

11   *Crawford*, 541 U.S. at 53-54 (2004); *Davis v. Washington*, 547 U.S. 813, 821(2006).  In general,

12   testimonial statements are "solemn declaration[s] or affirmation[s] made for the purpose of

13   establishing or proving some fact."  *Crawford*, 541 U.S. at 51.

14   However, the confrontation clause "does not bar the use of testimonial statements for

15   purposes other than establishing the truth of the matter asserted.  *Id*. at 59, n.9.; *Tennessee* v.

16   *Street,* 471 U.S. 409, 414 (1985).  "Out-of-court statements that are related by [an] expert solely

17   for the purpose of explaining the assumptions on which [his expert] opinion rests are not offered

18   for their truth and thus fall outside the scope of the confrontation clause."  *See Williams v.*

19   *Illinois*, 567 U.S. 50, 58 (2012).  "'The question is whether the expert is, in essence, giving an

20   independent judgment or merely acting as a transmitter for testimonial hearsay.  As long as he is

21   applying his training and experience to the sources before him and reaching an independent

22   judgment, there will typically be no *Crawford* problem.'"  *United States v. Gomez*, 725 F.3d

23   1121, 1129-30 (9th Cir. 2013) (quoting *United States v. Johnson*, 587 F.3d 625, 635 (4th Cir.

24   2009)); *see also Hill v. Virga*, 588 F. App'x. 723, 724 (9th Cir. 2014) (noting that the U.S.

25   Supreme Court has not held that a gang expert's reliance on hearsay testimony violates a

26   defendant's confrontation clause rights under *Crawford*); *United States v. Vera*, 770 F.3d 1232,

27   1239 (9th Cir. 2014) (holding that a gang expert was not a "conduit for admission of hearsay in

28   violation of *Crawford*" when he applied his training and experience to sources before him to

19

1  reach an independent judgment about defendant's gang status and "did not impart [hearsay]

2  information for its own sake, but to explain this basis for his expert opinion"); *Hernandez v.*

3  *Robertson*, No. CV 18-08513-JGB (AS), 2019 WL 4364948, at *9 (C.D. Cal. July 19, 2019)

4  ("[T]he United States Supreme Court has not held that a gang expert's reliance on hearsay

5  testimony violates a defendant's confrontation clause rights under *Crawford*."); *Smith v. Uribe*,

6  No. CV 13-2444-VAP (SP), 2016 U.S. Dist. LEXIS 38945, at *15 (C.D. Cal. Jan. 12, 2016)

7  (finding no confrontation clause violation where a gang expert based his opinion that the

8  petitioner was a member of a gang on statements made by other detectives about their interactions

9  with the petitioner).

10        The record reflects that Fry testified at trial that he had worked for ten years with the

11  Fresno Police Department, was a detective with the Multi Agency Gang Enforcement

12  Consortium, participated in numerous formal and informal gang-related training, had daily

13  contact with gang members as part of his duties, and his work focused on the Northside Pleasant

14  gang.  (Doc. 17-9 at 11-19).  Fry reviewed daily reports about gang activity, conferred with other

15  detectives about trends in gang activity, and had a familiarity with certain gang tattoos, colors,

16  and individuals who admitted to gang membership.  (*Id*. at 19).  Fry created "gang packets" on

17  each possible gang member arrested, in which he compiled information from various sources to

18  determine whether the suspect was part of a gang.  (*Id*. at 24-26).  Fry interacted with "no less

19  than a thousand" gang members during his career, at least 30 of which were Northside Pleasant

20  gang members.  (*Id*. at 20, 24).  Specifically, Fry had knowledge of the Northside Pleasant gang's

21  activities, symbols, social media postings, and location.  (*Id*. at 21-23).  Fry testified that he had

22  multiple personal contacts with Henderson, including arresting him several times.  (*Id*. at 26-28).

23  Fry opined that Henderson was a member of the Northside Pleasant gang based on his

24  investigation into Henderson, his arrests of Henderson, his clothing, use of gang signs, and social

25  media postings.  (*Id*. at 28-29).  Although Fry testified that he did not have any personal contact

26  with Banks, he opined that Banks was a member of the Northside Pleasant gang because Banks

27  had admitted to being a member to other officers, had gang tattoos, wore gang colors, and

28  associated with known gang members.  (*Id*. at 31-32).

1    Reviewing Petitioner's Sixth Amendment claim through the deferential lens of § 2254(d),

2    the undersigned finds Petitioner fails to demonstrate the state court's decision was unreasonable

3    or based upon facts not supported in the record.  The state appellate court correctly identified and

4    applied *Crawford,* which is the clearly established federal law applicable to confrontation claims

5    involving hearsay.  Further, the record supports the state court's factual findings that Fry applied

6    "his training and experience to the sources before him and reach[ed] an independent judgment"

7    on Banks' and Henderson's gang membership.  *Smith*, 2016 U.S. Dist. LEXIS 38945, at *15.

8    Therefore, Fry did not act as a "conduit for admission of hearsay" because any hearsay

9    information was "not offered for [its] truth and thus fall[s] outside the scope of the confrontation

10   clause."  *See Vera*, 770 F.3d at 1239; *Williams*, 567 U.S. at 58.  Thus, the undersigned finds

11   Bonilla has not demonstrated a violation of his Sixth Amendment rights.

12       **4. Harmless Error**

13   Even if Bonilla could prove that a constitutional violation occurred, *Crawford* violations

14   are subject to harmless error review.  *See Delaware v. Van Arsdall*, 475 U.S. 673, 684, (1986).

15                  **i. State Appellate Court Decision**

16   Here, in the alternative, the Court of Appeal assumed that Fry's testimony about Banks

17   constituted an erroneous admission of testimonial hearsay in violation of *Crawford*.  (Doc. No.

18   17-14 at 30).  However, the court, relying on the harmless error standard of *Chapman v.*

19   *California*, 386 U.S. 18, 24 (1967), found that any error in the admission of Fry's testimony was

20   harmless beyond a reasonable doubt.  (*Id*. at 30-35).  Specifically, the Court of Appeal found:

21
> The erroneous admission of nontestimonial hearsay is a violation of
22   state law subject to the harmless error standard set out in *People v.*
> *Watson* (1956) 46 Cal.2d 818, 299 P.2d 243.  (*Sanchez, supra*, 63
23   Cal.4th at pp. 685, 698.)  Pursuant to this standard, reversal is
> required only if it is reasonably probable that the defendant would
24   have achieved a more favorable result if not for the error.  (*People*
> *v. Wall* (2017) 3 Cal.5th 1048, 1060, 224 Cal. Rptr. 3d 861, 404
25   P.3d 1209.)  The erroneous admission of case-specific testimonial
> hearsay in violation of the confrontation clause is "an error of
26   federal constitutional magnitude," and requires reversal unless the
> error is harmless beyond a reasonable doubt pursuant to *Chapman,*
27   *supra*, 386 U.S. at page 24.  (*Sanchez, supra*, at pp. 685, 698.)

28       ///

21

Defendant asserts the error is prejudicial under the federal harmless error analysis.  In *Sanchez*, "much of the hearsay was testimonial," thus the court applied the federal prejudice standard in conducting its harmless error analysis.  (*Sanchez*, 63 Cal.4th at p. 698.)  As we have assumed a mix of testimonial (as to Banks) and nontestimonial (as to Henderson) hearsay was erroneously admitted through Detective Fry, we will apply the federal standard for purposes of determining whether the error was harmless: whether the admission of hearsay was harmless beyond a reasonable doubt under *Chapman*.  (*Sanchez, supra*, at p. 698.)

The *Chapman* standard requires reversal unless the People establish "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Chapman, supra*, 386 U.S. at p. 24.)  "To say that an error did not contribute to ensuing verdict is ... to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." (*People v. Neal* (2003) 31 Cal.4th 63, 86, 1 Cal. Rptr. 3d 650, 72 P.3d 280.)  In other words, if upon a thorough examination of the record, the court can conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error, the error is harmless.  (*People v. Mil* (2012) 53 Cal.4th 400, 418, 135 Cal. Rptr. 3d 339, 266 P.3d 1030.)  Even pursuant to this more stringent standard, beyond a reasonable doubt the jury verdict was not affected by the introduction of hearsay relevant to Northside Pleasant's pattern of criminal gang activity.

Detective Fry's opinion Banks is a Northside Pleasant gang member was based on hearsay because Fry had no personal knowledge of Banks, some of which Fry related to the jury.  Yet even without the admission of this case-specific hearsay, the value of Fry's opinion is not undercut nor does the absence of this hearsay leave the jury without sufficient bases to evaluate the probative weight of the opinion.  Fry testified at length about his extensive experience with Black gangs in Fresno and his MAGEC unit assignment, which centers on Black gangs.  Fry explained he assists with felony assault, robbery, and homicide detectives investigating crimes that are considered Black-gang related.  In that capacity, he reviews reports authorized by patrol officers and detectives.  Moreover, he is tasked with preparing a gang packet to validate gang members *whenever* an individual is arrested for gang-related crimes specific to Black gangs in Fresno.

To validate gang members, Fry looks at a variety of factors such as whether the subject associates with known gang members, self-admits to gang membership, wears gang clothing, and has gang-associated tattoos.  Fry examines multiple sources of information, including the FPDRMS, which lists all of a subject's information, gang associations, and contacts with law enforcement; police reports written by patrol officers and detectives; field interview reports generated by patrol officers and detectives; discussions with other officers; and he reviews social media for photographic indicia of gang membership.

///

22

Moreover, Fry testified to extensive personal contacts with Northside Pleasant gang members, and his work with the North Bureau Impact Team had focused on Northside Pleasant territory. Fry's training and experience, in combination with his testimony about the particular sources of information he researches to validate a gang member, lends credibility and material support for his expert opinion Banks was a Northside Pleasant gang member, even absent revealing to the jury some specific details about Banks that Fry uncovered in his research. The jury knew how Fry conducted his validation research, the factors he considered, and the sources of information he reviewed; and the jury was apprised of Fry's experience and training in making these specific types of validations. In other words, the jury knew a great deal about Fry's validation process and, even without the hearsay details, was positioned to evaluate his experience, the thoroughness of his process, and the reliability of the sources of his information when deciding the weight to assign his opinion. In light of Fry's plethora of training, experience, and extensive research, the probative value of his ultimate validation opinion as to Banks would not have been diminished had he not recited some hearsay details about Banks.

The same is true of the support for Fry's opinion Henderson is a Northside Pleasant member, but even more so. Fry conducted the same validation research as to Henderson and testified to multiple prior contacts with Henderson, including personally arresting Henderson on more than one occasion. Not only were the details about Henderson having gang associations, being arrested with gang members, and wearing gang clothing not necessarily hearsay, the jury had an additional basis to credit Fry's ultimate opinion: Fry did not just research Henderson, he *knew* Henderson from their multiple contacts. As to Fry's assumed hearsay testimony about the photographs, that detail offered very little additional evidence to corroborate Henderson's affiliation with Northside Pleasant. It is not clear whether Henderson himself was making gang signs in the photographs (arguably a nonverbal self-admission of gang membership), and there was already evidence Henderson associated with known gang members (which was likely based on Fry's personal knowledge). Even without Fry's testimony about the photographs, Fry's opinion Henderson was a Northside Pleasant gang member was supported by a decisive margin. Beyond a reasonable doubt, the jury would have credited Fry's opinion about Henderson even absent the testimony about the photographs.

Defendant does not challenge Fry's basis-testimony as to his opinion Collins Stowers is a Northside Pleasant gang member, but there was an abundance of evidence to support Fry's opinion in this regard. Again, the details of Fry's experience and research process in validating gang members was, by itself, more than sufficient to support Fry's validation of Stowers. Even beyond validation research, Fry had personal knowledge of Stowers, and Fry was present for the testimony of Officer Wilkin. Wilkin testified he had a prior contact with Stowers where he was able to observe Stowers had a tattoo of the numbers 4 and 5 with a diamond over it, which Fry testified was indicative of Northside Pleasant.

23

Even absent any case-specific testimonial hearsay as to Banks and nontestimonial hearsay as to Henderson, there remained ample support for Fry's opinion that Banks, Henderson, and Stowers were Northside Pleasant gang members.  Thus, the predicate offenses necessary to show Northside Pleasant's pattern of criminal gang activity were established.  (§ 186.22, subd. (e) [gang engages in pattern of criminal gang activity when its members participate in "two or more" statutorily enumerated criminal offenses that are committed within a specific time frame "on separate occasions, or by two or more persons"].)  But even if Fry's opinions about Banks and Henderson was completely undermined by the erroneous admission of the hearsay discussed above—which it was not—we still conclude beyond a reasonable doubt the jury's verdict was not affected by the admission of that evidence.

The jury was instructed it could consider whether defendant engaged in the charged conduct for the benefit of, at the direction of, or in association with East Lane Crips.  Defendant does not challenge Fry's testimony about the predicate offenses offered to establish East Lane Crips's pattern of criminal gang activity.  However, he argues the prosecution told the jury to focus on Northside Pleasant and the evidence about East Lane Crips was "much more tenuous" because Jarmal/Jlokz was the instigator of the assault and it was committed in Northside Pleasant territory, not East Lane Crips territory.

We agree the prosecutor's closing argument did not emphasize the evidence relevant to East Lane Crips's existence as a criminal street gang or its predicate offenses.  However, the existence of East Lane Crips as a criminal street gang and the benefit of defendant's conduct to East Lane Crips was supported by the evidence; we disagree this theory was factually "more tenuous" than evidence defendant's conduct was committed for the benefit of, at the direction of, or in association with Northside Pleasant.  Fry testified crimes like those charged against defendant would benefit, and would be intended to benefit, a gang member's own reputation and that of his gang.  Fry testified as to East Lane Crips's primary activities, and the prosecution offered evidence of three predicate offenses, which were among East Lane Crips's primary activities and were committed by individuals Fry opined were East Lane Crips gang members: Javonte Askew, Michael Smith, and Nicholas Smith.  Fry had personal contacts with Askew, and there was other evidence about Askew introduced through Detective Davis, who had personal contact with Askew and knew him to be an East Lane Crips member.

The prosecution also offered evidence of defendant's East Lane Crips gang membership, including that defendant had various gang tattoos, he associates with known gang members, and he has admitted membership with East Lane Crips.  These facts were offered through witnesses with personal knowledge, including Fry, Detective Mayo, Detective Davis, Sergeant Smith, Officer Aguilar, and Detective Archan.  In other words, there was evidence of multiple predicate offenses for the jury to consider as well as evidence they were committed by East Lane Crips gang members—

24

which defendant does not challenge.  Despite the prosecutor's emphasis on Northside Pleasant, the jury was not bound to that single theory; the existence of East Lane Crips as a criminal street gang was factually well supported by the evidence.

Moreover, the jury was instructed on the elements necessary to conclude East Lane Crips was a criminal street gang for purposes of the enhancement allegations, and defendant does not challenge that instruction.  The jury was also instructed that if it found defendant guilty of any of the charged crimes, it could consider those crimes in deciding whether one of East Lane Crips's primary activities was the commission of that crime and whether East Lane Crips's pattern of criminal gang activity had been proven.  Defendant's gang membership with East Lane Crips was factually supported, which offered more predicate offenses to support East Lane Crips's pattern of criminal gang activity.  The theory defendant benefited East Lane Crips, a criminal street gang, through engaging in the charged conduct was factually supported by the evidence, the jury was instructed on this theory, and we presume the jury understood and followed the instructions.  (*People v. Wilson* (2008) 44 Cal.4th 758, 803, 80 Cal. Rptr. 3d 211, 187 P.3d 1041.)

In sum, the admissible evidence amply supported the jury's verdict, and we conclude beyond a reasonable doubt the jury's true findings on the gang enhancement were not affected by the admission of what we presume was testimonial and nontestimonial hearsay.

*Bonilla*, No. F075199, at *48-58.

### ii.  Analysis- Harmless Error

Under *Chapman*, "the test for determining whether a constitutional error is harmless . . . is whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'"  *Neder v. United States*, 527 U.S. 1, 15 (1999) (quoting *Chapman*, 386 U.S. at 24).  Under this standard, this Court asks whether the Court of Appeal applied *Chapman* in an "objectively unreasonable" manner, *see Lockye v. Andrade*, 538 U.S. 63, 75 (2003), meaning this court asks whether the "*harmlessness determination itself* was unreasonable," *Fry v. Pliler*, 551 U.S. 112, 119 (2007) (emphasis in original).  To meet this standard, Bonilla must show that the state court's decision to reject his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Richter*, 562 U.S. at 103.  To do so, Bonilla must show that the evidence admitted had a "substantial and injurious effect or influence in determining the jury's verdict."  *Brecht*, 507 U.S. at 62.

25

1       Here, the state appellate court found the admission of Fry's testimony was harmless

2   beyond a reasonable doubt even though the court found that some of Fry's testimony about Banks

3   was based on hearsay.  Specifically, the state court noted that Fry had extensive experience

4   identifying African American gangs and gang members and that he reviewed every arrest for

5   gang-related crimes specific to African American gangs in Fresno.  (Doc. No. 17-14 at 31).  To

6   identify gang members, Fry looked at multiple sources of information, including police officers'

7   field reports and suspects' social media postings.  (*Id.*).  Fry testified to having extensive contacts

8   with Northside Pleasant gang members.  (*Id.* at 32).  In short, the Court of Appeal found that

9   Fry's background knowledge and training lent support and credibility to his opinion that Banks

10   was a Northside Pleasant gang member and "would not have been diminished had he not recited

11   some hearsay details about Banks."  (*Id.*).  The Court of Appeal found that "the admissible

12   evidence amply supported the jury's verdict" and concluded that "beyond a reasonable doubt, the

13   jury's true findings on the gang enhancement were not affected by the admission of what we

14   presume was testimonial and nontestimonial hearsay."  (*Id.* at 35).

15       Applying § 2254(d) deferential standard, the undersigned cannot find that the state

16   appellate court's harmless error determination was unreasonable.  There was ample non-hearsay

17   information upon which the jury could find that Henderson and Banks were Northside Pleasant

18   gang members.  Bonilla has failed to show how Fry's testimony had a "substantial and injurious

19   effect or influence in determining the jury's verdict."  *Brecht*, 507 U.S. at 62.

20       In summary, Petitioner fails to demonstrate that the state court's rejection of his Sixth

21   Amendment confrontation claim was contrary to clearly established law or based upon an

22   unreasonable determination of the facts considering the evidence presented.  Consequently, the

23   undersigned recommends Petitioner should be denied any relief on his petition.

24   **IV.  CERTIFICATE OF APPEALABILITY**

25       A petitioner seeking a writ of habeas corpus has no absolute right to appeal a district

26   court's denial of a petition; he may appeal only in limited circumstances.  *See* 28 U.S.C. § 2253;

27   *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003).  Rule 11 Governing § 2254 Cases requires a

28   district court to issue or deny a certificate of appealability when entering a final order adverse to a

1 petitioner.  *See also* Ninth Circuit Rule 22-1(a); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th

2 Cir. 1997).  A certificate of appealability will not issue unless a petitioner makes "a substantial

3 showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  This standard requires

4 the petitioner to show that "jurists of reason could disagree with the district court's resolution of

5 his constitutional claims or that jurists could conclude the issues presented are adequate to

6 deserve encouragement to proceed further."  *Miller-El*, 537 U.S. at 327; *accord Slack v.*

7 *McDaniel*, 529 U.S. 473, 484 (2000).  Here, Petitioner has not made a substantial showing of the

8 denial of a constitutional right.  Thus, the undersigned recommends that the court decline to issue

9 a certificate of appealability.

10 Accordingly, it is **RECOMMENDED**:

11 1.  Petitioner be denied all relief on his petition.  (Doc. No. 1).

12 2.  Petitioner be denied a certificate of appealability.

13 **NOTICE TO PARTIES**

14 These findings and recommendations will be submitted to the United States district judge

15 assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within fourteen (14)

16 days after being served with these findings and recommendations, a party may file written

17 objections with the Court.  The document should be captioned "Objections to Magistrate Judge's

18 Findings and Recommendations."  Parties are advised that failure to file objections within the

19 specified time may result in the waiver of rights on appeal.  *Wilkerson v. Wheeler*, 772 F.3d 834,

20 838-39 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

21

22 Dated:    December 29, 2021

23 HELENA M. BARCH-KUCHTA

24 UNITED STATES MAGISTRATE JUDGE

25

26

27

28

27